Akar, the appellant in this case. We would like to begin with the first two points in our brief. I will argue point 1 and Ms. Van Ness will argue point 2. Both points focus on errors affecting the jurors' evaluation of the testimony of John Taylor, the government's key witness. Taylor's narrative of the events inside the apartment 101 at 215 Charles Street, in essence that he was an unwitting duke and a passive witness to the murders of three individuals, was the centerpiece of the government's case for death. He was the source of the government's case for who did what inside the apartment. The defense countered this narrative with statements from Ephraim Johnson, the only other eyewitness to the events inside the apartment. According to Ephraim, he and Taylor were far more involved than Taylor suggested. Both helped tape Ms. Johnson. Taylor punched and then struck her with a pipe. The counter-narrative undercuts Taylor's account and should have left the jurors unsure as to what actually happened inside the apartment. This was offered at the penalty phase and so it wasn't as to your client's guilt, it was on the aggravators of the heinousness of the crime and the multiple murders that could be attributed to your client. Is that the essence of why Johnson's testimony was forced, not testimony? His out-of-court statements were put before the jury at the penalty phase? That's correct. It's for sentencing purposes to undercut Taylor's account of what happened inside the apartment. Right, so that they could then consider these aggravators. So aggravators and also the mitigators that Ephraim Johnson and John Taylor wouldn't face death for their participation. Right, okay, so those three factors, two aggravating well so generally what the narrative of what actually occurred inside the apartment like the who did what inside the apartment but right to the aggravator of the torture aggravator, the procurement for payment, John Taylor is the only source of the information for that aggravator, the substantial planning and... We understood that you were not arguing now that they told different versions and that cast doubt on the culpability verdict, it's all those two factors. That's correct. A series of errors, however, improperly placed a thumb on the scale and undermined the jury's ability to weigh these accounts fairly. The government vouched, it injected its own belief that Ephraim had lied. It misleadingly suggested that during the plea allocution, Ephraim Johnson maturely changed his narrative, that he renounced his prior statements that he had helped Taylor. This is the statement that he hadn't mentioned Taylor with respect to the case. That's correct, at a plea allocution when he was allocated as to what the facts which he was putting. And then the third is summation comments where the jurors were urged to discount Mr. Johnson's statements because they were inconsistent with the defense theory of the case, had guilt. These errors mattered because the government relied heavily on Taylor's account to argue for death. They cited his testimony that Ezebo and Ezequiel taped the victims and the manner in which the murders involved torture. They cited Taylor's testimony that when he asked Ezebo what was going on after seeing Ezebo beat Tina like it was a meat market, he said, come get you some. Now, here's my question. Are you arguing that these statements in themselves are sufficient error so that the sentence of death should be vacated? Or are you arguing that these statements, even if they weren't sufficient error in themselves, required the court to make instructions sufficient to make clear to the jury their role? Or are you arguing both? Both, actually. Each of the three errors that we've addressed in point one alone would have set a mistrial. There was no curative instruction that could have cured, but in any event, the curative instructions that were given didn't cure. They didn't address it. Let's put that firmly into context on the voucher, which is almost like a reverse voucher. They were arguing your client lied, not that he was telling the truth. There, there was an objection that was sustained, and if I read your mistrial or further instructions, right? That's correct. So we are evaluating that on a plain error review, right? That's correct. All right. Now, with respect to the plea renunciation, the situation there was what with respect to objections? The defense counsel did not object. Right. So there we have a default. And the summation, different theories, when there was an objection, the district court charged the jury that counsel's strategy was not to enter into its deliberation. No request for a mistrial, no request for further instructions, right? That's correct. All right. I mean, it seems to me that you have a heavy burden here, so help us see how you carry it. What happened inside the apartment? There are only two eyewitnesses to what actually happened inside the apartment, Johnson and Taylor. The government relied extensively on Taylor as to what set this case apart. It's the torture aggravator. It's the come get you stuff. It's the bashing them with a baseball bat, like I said, a meat market. This is what in the trilogy then of errors, they impair the jury's ability to weigh. I'm not sure I understand that completely. I mean, there was the instruction to disregard the question about the lie. We presume the jury follow instruction. There was the instruction not to consider defense strategy. We presume the jury followed that. So you're going to have to point out more, not in terms of just arguing the importance of these two people's relative credibility, but how we would find that even with those instructions, we've got the kind of error here that could not be cured. Neither curative instruction went to the actual harm, right? You've got to make a somewhat different argument. You have to make an argument that the role of the jury in sentencing in a capital case is different from the role of the jury in any other situation, which of course it is. There's no other situation in which the jury does what it does in a capital case, and that the jury belongs to the nation, as we wrote in Nelson, and not to the parties. And that whether the parties make an objection or not doesn't say whether the jury is a fair and complete jury for making this decision. You have to say that somehow here, more is required than in ordinary, plain error situations. It's something more about the argument you have to make for it. So the juror's sentence determination is not only a fact determination. It is a moral response to the relative weight of the aggravators and the mitigators. This is a very mitigated case. Very aggravated cases in this circuit have received sentences of life from jurors. And this court has recognized that vouching, for example, cuts to the heart of the fair trial concerns in Modica. The court there said that there's a worry that when the prosecutor puts their opinion before the jurors, they will not be able to set it aside, no matter how baseless or biased. Would it have been all right for, in your view, than the prosecutors simply to point out, because A, the defendant called Johnson about as to some of this, didn't they? Or, excuse me, called the FBI investigator with regard to Johnson's statement, didn't it? Yes, that's correct. And you solicited from him or your predecessor solicited from him a number of his statements, which occurred over a number of proper sessions and interviews, correct? Correct. But the initial questioning did not differentiate between whether they were a proper session or an initial interview of him, did they, at least as to the presentation of direct? That's correct. Was it fair for the government to introduce the idea that there were differences with regard to the two types of interviews, in light of the fact that you'd called the witness? So I'm not, I don't think that would have been error sufficient to warrant setting aside. So would it have been fair then for the government to have introduced the fact that this, that at least several of the interviews occurred during a period of time where the government was considering, where the government had indicated to Johnson that if he were truthful and forthcoming, that again in his proper, that he would have the benefit of a plea arrangement which would avoid the death penalty? I think that's embarking on dangerous ground at that point, and that's the reason. So you called the witness, you called the witness and you introduced evidence that he made a series of statements. Is it not fair to seek out what the surrounding circumstances of those statements were? I think it may well be, but they didn't stop there. They immediately went to the reason why. What they cared about was the why. He was denied a cooperation agreement because, quote unquote, it was determined he was lying. Could they have asked the following question? Was he denied proper because he made four completely inconsistent statements and he could they have said those words? Again, I think that, could they have said those words? That is a far closer question. That doesn't, right, the it was determined he was lying goes to the heart of the vouching problem. Were his statements not completely inconsistent? They were no more inconsistent than Taylor's. No, I'm not asking about others. I'm asking about his. He had, there are in many trials, there are lots of inconsistent statements. It's the nature of testimony sometimes. But I'm asking you as to Mr. Johnson, were not his statements inconsistent? They were. They had, he had, would it have been improper for the government to simply have said was one of the reasons why he didn't end up getting an offer was because his statements were entirely inconsistent? I believe so. The why doesn't matter. They did point out his inconsistency. That's a different, that's a relevancy question. That's not a vouching question. That, I mean, the vouching here is that the reverse vouching is that because you believed he was lying. Now we're in a, the entire record shows the government urged the jury and information to find that he was lying. And it cited all these inconsistencies that Judge Wesley just alluded to. You're not objecting to any of that. So the question becomes whether having asked a question that suggested not only that they wanted the jury to believe that he was lying, but that they believed he was lying was a problem even with a curative instruction. I mean, you know, you say it can't be cured. I mean, I can think of lots of things the judge might have said, including it's solely for you to decide credibility, ladies and gentlemen, and it doesn't matter a whit what any of the parties think. You didn't ask for that, it wasn't given. You're up here saying there's nothing the judge could have said that would have cured this error, and that I'm finding hard to follow. But I don't need to go that far because the curative instruction didn't cure it. All right, but then you get into why not. And you know, one of the things we sometimes take into account here is that experienced counsel, certainly experienced counsel in this case, sometimes doesn't ask for more because they're there and they've watched it play out and they don't think there's a need for more. It's only on appeal that we're being asked to think that maybe there was a need for more. And in this case, that's not this case. They objected when the government first introduced its desire to put before the juror their subjective belief, the agent's subjective belief that Johnson was lying in a colloquy about keeping these statements away from the jurors. That isn't the question of whether in a case of this sort, the court has a duty beyond what it has in other cases to make the kind of instructions so that this singular jury decision is made right, to make the kind of instruction that Judge Raji as a district court made, nobody asked her to, in a capital case where she was. So that instead of simply denying the, I mean, granting the objection that the district court should then on its own, apart from the tactics of the parties, because the tactics of the parties may be even to have a jury which is half black and half Jewish. And we said, you can't do that. The tactics of the party may be different from what is needed by a court in a situation of this sort. Absolutely. This is a different kind of decision. This is not a fact finding. This is not guilt or so that the jury can make the decision that it is uniquely given by the Supreme Court to make. That's right. And in this case, the jury was out for two days on sentencing and they split the verdict. What happened inside the apartment mattered to them. They were not able to reach it. We're not as concerned, I don't think, with whether this is harmless error or not. I know government suggested it's harmless error, but I think that really the question is whether objections should have been made if they weren't made, what the consequences are, and what the duty of the court is in the absence of objections. I think that's really what the essence of what is going on here is. At least for me, that is. All right. I know you want to reserve some time for a final response, but thank you. Good afternoon. I'm going to address point two. And are these the only two points that are going to be argued this afternoon? Yes, Your Honor, though, of course, we are prepared to address any questions. That's fine. I just wanted to be sure I knew how you all planned to address the issues. Yes, and we have divided up the issues, and I think we sent you a letter about who is what. Ms. Ennis, can you pull the microphone down? Yes. So you can lower the volume if you wish. Oh, that's okay. Thank you. It may not have been clear to me, though, that you were only going to address two issues in our argument, but please go ahead. All right. With respect to the issue you raised in point two, John Taylor told the jury that he expected to die in prison, which bolstered his credibility very significantly. Unlike all of the other cooperators in this case, and there were many, Taylor presented himself as having no motive to curry favor with the government by helping to secure a conviction or a death sentence. That motive... He did say, though, that he hoped for a sentence reduction. He said only that he was hoping for a lesser sentence, and if that's all he had said, I would not be making this argument. But the government went on and said, do you expect to go home tomorrow? No. When do you expect to go home? And he said, I don't expect to ever get out of prison. So that last question, it was the last question of this direct examination. What happened on cross, then, on that issue? Well, there was no cross on that issue, and I don't believe, Your Honor, that there could have been. Barely. I would have thought you could have sold that cross-examination. It would have been so... It would have presented so many opportunities for undermining it. Well, first of all, we have to recognize that John Taylor was the only witness who faced a mandatory minimum sentence of life without release. Everybody else had a much lesser minimum. But that mandatory minimum could have been affected by his cooperation. Yes. He could have been cross-examined on whether he knew that fact and what his expectations were. He could have been cross-examined on the points that you developed so fully in your brief, namely that so many other people who faced life sentences have gotten consideration from the court. And I am just totally perplexed at the argument to us that it was prejudicial error to elicit that when no effort was made to cross-examine on it. Help me out. I don't believe that the defense attorney had any tools with which to challenge that statement. I'm sorry. I heard that kind of cross-examination for 15 years. Well, this is a statement by a 34-year-old man who faces a mandatory life without release sentence, who had just said he doesn't expect to get out of prison. The defense attorney, as far as we know, there's certainly no reason to think that he knew about this wonderful deal that Mr. Taylor's attorney was aware of, where an informant in another capital case who was guilty of intentional murder as an aider-in-bedder, not felony murder, got a five-year sentence. It's clear that Mr. Taylor's attorney knew that. It's clear that the trial prosecutors knew that because one of the trial prosecutors was actually involved in that case. That's the question of whether you're able to show perjury. And as I understand it, what you don't have is the link of anyone telling Mr. Taylor that. You're asking for a hearing to see if this lawyer told him that. Is that right? Well, depending on the attorney-client privilege, I don't know how the question would be posed, but we certainly would have reason to. Did you oppose the government eliciting attorney-client information from him when questions got in that vein at trial? We're in a completely different classroom, Your Honor. We're here arguing that that statement that he made was a deliberate statement that the government knew he was going to say, and there's a good-faith basis to believe. And tell me again, reconstruct for me what the factual premise is of the government's knowledge of that. I don't argue that they knew that he knew about the sentence. You said the government knew what he was going to say. I think that there's every reason to think that they knew what his answer would be, because why pose that ultimate question, which they didn't pose to any other witness, saying, when do you think you're going to go home? So I think they knew they were going to get a sentence which indicated that he didn't think he was going home. No, he didn't know. So how is that such a disingenuous, how is that such an indicator that they knew that somehow they cooked the books and asked the question and that they knew he was going to solicit that kind of answer? It's truthful. He didn't know. The offense he was charged with was punishable by life imprisonment, wasn't it? He didn't say he didn't know. He said he gave an answer. He said, I expect to die in prison. That's a substantive answer. So whether or not he got a benefit from being a cooperator, if you're 34 years old and you're facing mandatory minimum of life without release, you'd have to get a substantial benefit to get released. Comparing this, though, to the fact that his lawyer would know that in another case someone got a very favorable five-year sentence when they were charged with murder, right? His lawyer mentioned that to Judge Arterton when Mr. Taylor was sentenced in this case. That's what triggered this inquiry in our appellate review. He volunteered that to and tried to argue that Mr. Taylor should get a very lenient sentence by pointing out the single digit sentence that Mr. Lopez got. When he knew that? When he had come to know that? No, but he also said at sentencing for Mr. Taylor that they had spent a very long time discussing the consequences of an open-ended plea, which Mr. Taylor was not familiar with because his prior felony convictions were in state court where he pleaded guilty with a sentence promise. Mr. Taylor didn't know. So his lawyers told Judge Arterton that Taylor's sentence... I'm a little confused. Are you saying that you didn't cross-examine? I don't mean you, but the trial didn't cross-examine because at that time they had no reason to believe that Mr. Taylor would say anything except what he said. I don't know anything, and so that cross-examination, while possible, of course, would not have been helpful because he would have kept repeating the same thing, and that you have since learned something which would have enabled you to cross-examine had you known it. Is that what you're saying? Especially, I hadn't thought of that. The argument that doesn't quite register with me is that anyone in federal prison would have to know of the scores of cooperators who were facing life sentences and received considerably lesser sentences. Now, I'm not as familiar with the docket in Connecticut as I am in New York, but usually there are few people who know as much about the sentences imposed in the federal courts as those awaiting their own sentences, and he would have had to have known that people as notorious as Sammy Gravano, as, you know, any number of other mobsters who personally killed individuals served lesser sentences, and the decision was made not to cross-examine. Well, I think what Judge Kelly just said is my response to that. Now, his lawyer had a client. That's not the only basis for thinking that cooperators frequently get consideration. No, but I think there were, without any tools of knowing what Taylor knew, his state of mind, when he had just told the jury that he expected to die in prison, he hoped for a benefit, but he never expected to get a benefit sufficient to release him, that the lawyer did not have the censors, did not have the tools to impeach that statement, he didn't know what Taylor knew, but he did risk, with cross-examination, having Taylor reiterate that testimony and refuse to backtrack from it. Well, you would have faced that risk here. What if he'd never heard about the other client and his lawyer's representation of him? He would have only reiterated that. That's no different from a number of notorious mobs that faced life and did much less time for their cooperation. I agree with that. Again, the only reason we're here is because we have a link between a very generous single-digit sentence in Connecticut, in another capital case, for a prisoner who Taylor's testimony, Taylor's attorney, told the court that he had spent an inordinate amount of time going over the consequences of the plea. What you're saying is that the judgment on whether to cross-examine, it's not that cross-examination by saying, did you know that other people couldn't have been done, but that the judgment as to the effect of cross-examination would have been very different had they known about this, because then, had Taylor said something, they could have said something else. So it's got to be more nuanced than you're making it. It's not just that you couldn't cross-examine, but that the judgment on the tactics of cross-examination, if we're going to talk so much about tactics, which frankly, in a case like this, I'm not comfortable with, but if you're going to talk about tactics, then the tactics will depend on any number of nuances that are not involved, that were not known at the time. I agree with that. This is not a, we didn't get the information. This is, he lied and the government knew, right? No, no. Okay, then help me out. What is the claim? I thought it was, he lied and the government knew. No, I, if that's the impression I gave, I apologize. I'm not saying that we know the government knew he lied. This is not an APRU claim. I thought point two was the government suborned perjury. No, this is not an APRU claim. This is a claim that we have a good faith reason to believe that John Taylor lied, that his last question and answer on direct examination was designed to elicit that he never thought he'd get out of prison, that the government, we don't know what the government knew about what, whether he knew about the Lopez sentence or anything else that he knew. We're arguing that because we can't show perjury at this stage, we need to have a remand because of the critically important nature of Mr. Taylor's testimony and what this lie was The remand would be for Taylor to be called as a witness. He would have the prerogative of asserting his attorney client privilege, but it's his to assert. We don't know whether he will assert it. We could ask questions of him that wouldn't have to intrude on the attorney client privilege, though I think in a case of this importance, we would be able to certainly ask him questions about what he was told as opposed to what admissions he himself made. That's really the basis of the questions. In general, apart from what his attorney specifically told him, you know, did you have any information about other cooperators in the in the... Even if he did, so what? His cooperation room specifically said that it's left up to the judge. When the fellow argued in front of the judge that another cooperator had gotten five years, that didn't mean that he was guaranteed five years. There's no deal. This is what he said. Wait a second. Wait just a second. Appendix 5 for 94. What are you hoping happens to you? Answer. Lesser sentence. Of course he hoped for a lesser sentence. So he understood that by his cooperation he might get a lesser sentence. Next question. Do you think you're going to go home today? No. Today. No. Tomorrow. No. Do you think you're going to ever go home? I don't think I'm never going home. Okay. So I don't understand how you parse that answer into some kind of lie. He doesn't know. He doesn't know. There's no promise. What's he lying to? That he hoped... He should have said, I hope I can go home someday, but I'm not certain I ever will. Judge Wesley, if the record established that John Taylor had been told about the five-year sentence that this Lopez guy got... Okay, stop there. Did it mean he was entitled to a five-year sentence? No. No, it didn't. No, it didn't. So how is it that his understanding, or his perhaps being somewhat unknowing about it, he knows that if he testifies truthfully, he'll get a lesser sentence? That was the answer. But how is it that he's supposed to know that he's going to be going home? I'm not saying he knew what his sentence would be. Obviously, he could not know in advance what a sentence would be. But if he knew there was a possibility that other people had gotten a single-digit sentence... My problem with this, with this lie, is this. What you are ultimately trying to show is that he was lying. Now, if that is what you're ultimately trying to show, is there any chance at all that he won't claim the Fifth Amendment? I mean, I see where you're going, but in order to make your point, just as Judge Wesley has shown, he would have to say more than an ordinary, well, this or that or the other. He'd have to say something which was a crime. Now, how can you hope that somebody in that situation won't claim the Fifth Amendment? So I just don't see where this really would be going that could help you in any way. Explain to me where I'm wrong on that. Well, Your Honor, I think in this very singular context, as you have pointed out, that if John Taylor got on the stand and was asked a direct question, let's say it was appropriate to ask him, had you ever heard of Mr. Lopez? Did you ever know that another cooperator in a murder case got a five-year sentence? Did you ever realize that any cooperator who would face a five-year sentence or something, you know, under 20 years even, asked any of those questions, if he asserted a Fifth Amendment right, I think that the district court would be entitled, and so would you, to draw negative inference from that very specific question that he lied at Mr. Ackar's trial. I'm not sure it's that question, but if he answers yes to any of those questions and then you ask him anything about his testimony that there might be an issue. But I'll take you back to something. You said you want a question about what he knew about other cooperators getting single-digit or even five-year sentences, right? Well, that would be among a panoply of questions. That's exactly the kind of question we could have crossed examine in the past. That's exactly the question you could have asked. Your Honor, first of all, that presupposes that the defense counsel is aware of those kinds of cases in Connecticut, and I don't know if he was. I'm not sure whether you need to know them only in Connecticut to ask the question if you think that the fellow is not telling the truth when he says he doesn't intend to go home. I mean, presumably, you think he's not telling the truth because everybody who practices criminal law knows that defendants who have faced life sentences for murder have cooperated and a hearing, a remanded hearing, there could be questions posed to the defense attorney. But if it turns out it was a strategic decision, then I think we would, and it also turns out that Taylor was aware that he could get a substantial sentence reduction and get released so that his testimony was a lie, that we would be able to... We don't have an ineffective assistance of counsel claim on this appeal, nor do I think we could. That would have to be a collateral challenge, but I am... All right, so what you want to do at a hearing is you want to ask him if he's heard of Lopez, heard of Lopez's sentence, and if he says yes, then you would want to be able to pursue it further as to whether his statement that he expected never to get into jail was a lie. There are a range of questions along those lines, so those aren't the only two questions, because maybe he wouldn't remember who Lopez was, or maybe just the concept that he was aware that people convicted of intentional murder as cooperators could get a substantial reduction off the life sentence, a reduction significant enough where they might get released. And if his answer in the end is, yes, I know that, but I've been told over and over again there are no promises to me, so if I sit here right now, I'm not expecting ever to go home. I hope I'm going to get a lesser sentence, but I'm not expecting ever to go home. Is that where we could wind up with all this? I still think that the answer that he gave was a substantive answer, that he expected, whether he got a benefit or not, that it would not be significant. That's why you're allowed to cross-examine, to test these kind of statements. You're here arguing, and this is in your brief, that this was a deliberately elicited, misleading statement. So, I mean, this is where I got the idea that your argument was it's perjury and the government knew it. Because I'm not sure anything less gets you and your client anywhere now. Now you're saying, well, we have to do it in two steps. First, we have to have a hearing to demonstrate that, and then we'll make the argument. I've cited a line of cases in the brief that I know you're familiar with, that stem from Townsend v. Burke, this Penn Court case, which told that at sentencing in particular, it violates due process for a defendant to be sentenced based on material misapprehension effect or a material misstatement effect. But you're not there yet. You're not there yet that it's a material misstatement effect. That's, well, because you don't, if Mr. Taylor admitted at a hearing that he knew that other people with even worse crimes, because Mr. Lopez was convicted of intentional murder, not felony murder, had gotten a single-digit sentence, then I think there would be ample reason to conclude that his statement, that he expected to die in prison, was a lie. I think that that would be... Right. Thank you very much. I know you want to reserve time for... And, Judge, one more thing on what could happen in a hearing. The questions could also be asked about what Mr. Taylor was told by the prosecutors about the possible sentence. We've asked that on cross-examination, too. Indeed, that is exactly the kind of thing that defense attorneys ask all the time on cross-examination. Again, in this case, I think it would be a risk without having any tools. Your argument to that is that asking that without what you learned later would be too risky to do. That has to be consistently your argument, that of course you could have made all those arguments, but that a good lawyer would not make them without knowing what you know now. And so that, in effect, you have to be arguing that you were deprived of the possibility of a serious cross-examination because you did not know what was in fact known. That has to be the argument. That is my argument. Before you sit down, the statement you're saying is a lie, is that he expected never to go home. I mean, he didn't say, I'm expecting to serve at least 20 years, or I'm expecting... It's that he expected never to go home. Defense counsel was unaware of any cooperator facing a life sentence who had received consideration of any kind in Connecticut? The record certainly doesn't contain any information to say that he was. But he put nothing before us on that. I mean, I would be stunned. I mean, the federal courts are full of such cooperators. Well, I'm not aware of that, Your Honor, and I can only say that... Before you sit down, the very question that he asked just before that answer, though, was that he was hoping to get a life sentence, wasn't it? Yes. He knew he... So the jury heard him say that there was a connection between his testimony and potentially a lesser sentence. Yes, and I... He knew a lesser sentence. He just didn't know what. Well, but a lesser sentence... That would be true, wouldn't it? Yes, and I... It would not be a true statement that he didn't know what he was going to get. Yes, but the hoping for a lesser sentence with a mandatory life as a minimum doesn't mean he's going to get out. I don't know if the accusation has an element of truth to it or an element of hope to it in that sense. I expect to be home tomorrow morning, but I can't guarantee that Delta will fly. They don't always fly early in the morning, but I have an expectation. But is there an element of truth to my expectation, such that my expectation is either false or true? I think if we establish that he was aware of this other... We already can by this very answer before. He was hoping for a lesser sentence. He knew the connection. You've got that already. The question is, does the word expect... Does the word expect have an element of truth or falsity to it? I think... You expect something to happen with regard to a result, but you can't measure whether that's true or false. You can only measure whether it's reasonable or unreasonable. Isn't that the case? I think that saying that he hoped for a lesser sentence in this context could be a 50-year sentence. Do you think that someone who says, I expect to spend the rest of my life in jail, is expressing a fact? He's expressing his expectation that he's not going to get a significant enough benefit to get released. Dayton, are you leading off? Thank you. And I will lower this. I'm not sure how. Yes, I think you did. Before you start, are one of you going to discuss the Sixth Amendment issue about the switching and the strategies between the merits and the sentencing? Yes, Your Honor. I have questions about that. Yes, Your Honor. I think you have the answer. Give him the mic real quick. Oh, I apologize. Did you hear me, Judge Calabrese? Okay. So the plan we had was I was going to address the first four points in our brief, which relate to issues that they've raised with respect to the guilt phase and the supplemental issue. And Attorney Jacobette Rodriguez-Kost was going to deal with issues five through ten. It's very confusing because you've numbered them differently, but the point is the question about which strategies and information will be dealt with by your colleagues. Yes, Your Honor. And in fact, we're prepared to answer questions on any issues, but since they only argued two, we'll just address these two at this time. So they're claiming for the first time on appeal that Taylor lied about his sentencing expectations based upon one statement to which they did not object. As Your Honor noted, John Taylor specifically testified that he hoped to receive a lesser sentence. He also reiterated that later, saying that the reason he was testifying was because he was looking for help. He also testified that he pled guilty to a cooperation agreement. That cooperation agreement was, in fact, in evidence. The jury heard a lot about 5K motions and the benefits those have for cooperating witnesses. He also testified that he could have been facing the death penalty, but that he was that government was not seeking it. And then he made the statement that he didn't think he was ever going home. And in the context it was made, it was a very sincere statement. He had just testified for hours about triple homicide that was incredibly brutal. He admitted that he didn't do anything to help the victims because he didn't want to end up locked up, his words. And, you know, he's sitting there facing three life sentences, as a matter of fact. But the statement is not material to the verdict. It goes to his credibility. It doesn't go to what a car did or what John Taylor did on the day of the actual murder. And the jury had plenty with which to test his credibility and his motive to testify. John Taylor admitted that he had five prior convictions, four for drug trafficking and one for robbery. He admitted that he had lied to protect himself. He lied to the police. He lied after he entered a proffer agreement. And he admitted lying even after he entered a cooperation agreement. Additionally, the government acknowledged on summation that we would be filing 5K letters for the cooperating witnesses and that those allowed the judge to give leniency. And the judge specifically instructed that the jury should scrutinize all the cooperating witnesses testimony because they, quote, had a motive to lie and to testify falsely and give favorable testimony to the prosecution because they were hoping to receive a lighter sentence. She also instructed the jury that a 5K permits her to depart below the mandatory minimum and impose whatever sentence she sees fit. A court is admitting. Yes, right to it. It was the government that asked him when he expected to come. Yes. What was the answer you expected to hear? I expected him to say, I don't know. It's up to the judge. Yes, I can understand that that is the frequently asked answer. Now, he said, I don't expect to ever go home. This was, you know, your lead cooperator. I wonder whether the government thought that he really expected never to go home as opposed to that he didn't know and whether there was, whether the real argument here is the failure to clarify that for the jury. What's your response to that? So, my response is. You were counsel below. I was. Yes, you were trial counsel. Yes, I was one of the trial counsel, but both of us were trial counsel, as a matter of fact. So, I don't believe that we had a duty to clarify that at that point. As has been pointed out, a car. It wasn't the question. I believe the question was, what did you expect him to answer? No, I think she told us that she expected him to say, I don't know. It'll be up to the judge, which is frequently the question and answer the fact. Right. He then started to cry and Judge Arterton pointed out that there was tissues on the stand and I stopped asking him questions. Is this really what happened when I sat down? That's after he says, I don't expect. What he said was, I don't think I'm never going home. And he started to cry. And again, it was a very sincere statement in the context that it was made. And again, this there's nothing inconsistent whatsoever. But assuming for the sake of argument, he knew about this five year sentence that a defendant in an unrelated case, which was a drive by shooting. Yes, John. You said something, this was a very sincere statement. Let me tell you something that is bothering me. Seeking a death penalty in a case like this is quite unusual. This was done here. And I take it it was done because basically you believe that Taylor was fundamentally telling the truth. As to what happened, and that therefore, this was particularly. My problem is that just as you now said, very sincere. My problem is that this record suggests that you went from your belief. And from your proper wanting the jury to share that belief to doing things which would tell the jury what they ought to believe and that the court did not do enough to make clear that it was their responsibility and not yours. Your sincerity is really very interesting because it moved you to do what you did. But my question is whether with that sincerity, without meaning to do anything wrong, you went beyond and took over what the jury's role was. So I'm being maybe more open than I should be. But that's what's bothering me about this case because the whole thing is very unusual. I mean, you know, in 50 years, one person has been executed for doing this kind of crime, federal, very unusual. There in 90 years, maybe three people have been. It's not a common thing. So something was moving you and I can understand it. But my question is, did you go too far? If I may respond, Your Honor. So with all due respect, it's not about what I thought, what I think is irrelevant in this particular case. That's the point. But we also the decision that the attorney general made to seek the death penalty in this case was made in January of 2009. John Taylor was not arrested until December of 2009. So it wasn't like a decision was made based solely on his testimony or what anyone thought about his testimony. The attorney general made the decision after this went through the entire death penalty protocol that this was an appropriate case. And there are many cases which we seek. I'm not disagreeing with the number of people who have been executed. I'm disagreeing with the number of situations where the death penalty is sought in cases like this. And I do not believe it's all that unusual around the country. Just to speak to the issue about a hearing, they're requesting a hearing and what they're required to show for a hearing are specific facts supported by competent evidence that has proven true would entitle them to relief. And this is what they've put forth. It's all speculation based upon what they believe. Taylor's attorney must have told him about a defendant in another case. They, as you've pointed out, cannot establish that Taylor would testify or that any questions they'd ask him would be proper, wouldn't violate the attorney client privilege, or that he wouldn't invoke the Fifth Amendment. But even if he did testify and he said, yeah, my attorney told me that someone in a drive-by shooting case who happened to be the driver, not the shooter, received five years, there's nothing inconsistent about him knowing that was a possibility but not believing it was a realistic possibility for him based upon the fact that he was involved in this horrible crime. It was a horrible crime. They all are. You're right. You're absolutely right. But even assuming that somehow, you can see from his testimony that he's not a very sophisticated individual. So, but- Taylor's alluded to that in his own sentencing. Yes. I don't think it was understood until his sentencing that he had some- I'm dealing with the specific facts here, which is he said, I'll turn on the low-cut. Yes. And I suggested to counsel that this was really not that significant because the cross-examination could have taken place in any event, and the response was that the record is devoid of any evidence that there was any other basis for doing that. And our own case law is full of cases mostly coming out of the New York courts involved cooperators who've gotten- who've been shown great leniency in return for considerable cooperation. Connecticut fall outside the norm in this regard? No, it doesn't. And in fact, if you look on page GA385, they- the Carr's attorney did, in fact, use the cross-examination technique that Your Honor is talking about here. When Rodney Wamble was on the stand, he was talking about the fact that he was facing 20 to life. And one of the trial counsel, one of Mr. Carr's trial counsel, started pushing him. You want to go home. You want time served. And he brought up counsel, a defendant in another case. His name is Booby Rogers. His real name is Hassan Rogers, who had cooperated in a case in Connecticut who had received a greatly reduced sentence. And counsel used this. Well, you know that Booby Rogers, you know, is out walking around right now even though he was facing 10 years. So you know that could happen to you. Isn't that true, Mr. Wamble? And you know you could get time served. So with all due respect to counsel, it doesn't make any sense that they didn't have any tools with which to cross-examine Mr. Taylor along the same lines. They could have used the exact same defendant. Now I'm puzzled. If you say that they did that in another context, in another hemisphere, in the same situation, and didn't do it in this one, I can't imagine why not. I mean, that starts sounding like an inadequacy to counsel, which isn't before us. But I mean, it's mighty odd. If they didn't do it for strategic reasons, then that's a different thing that I could understand. But now you're making an argument which is almost proving too much. The cross-examination of Mr. Wamble that you're just talking about occurred in this case. Yes, Your Honor. Yes. I just want to be sure I'd understood that. Yes. You have in the very same case a cross-examination. And now you're leaving me quite dazzled as to why it wasn't done here. I mean, can you explain to me what possible strategy would justify one and not the other? I mean, I know we don't have that there now, but that's going to come back, obviously. I think this goes back to the sincerity of the comment, Your Honor. I think that it came across, and that's what John Taylor subjectively believed at that moment. He had just looked at a lot of pictures of these victims, alleged to death, and when asked, why didn't you do something to help these people? If you didn't want them to die, why didn't you call 911 and why didn't you help them? And he said, because I didn't want to get locked up like I am now, which would be the least altruistic of motives. And he said that to the jury. And so that right there, you know, the fact that he just was answering these questions. The defendant was in a tough position here because the defendant's defense at trial on the criminal liability side of things was not there. And the other part of that defense was Taylor wasn't there either. Right. Right. So it's a tough thing to tear into Taylor. I mean, you want to say that Taylor's a liar, but you've already, I mean, I can understand why Womble wasn't around. Womble was the enforcer who had the earlier interdiction with Tina and some of the others when she first started her crack business in the building. And so Womble, and Womble's not part of the group that entered, or at least at least as far as Taylor's story goes, he wasn't. And so Womble provides information, but he doesn't provide the same kind of information that Taylor does. But the defendant's kind of in an odd situation because the defendant's defense at trial is I'm not there. Correct. Not there. Maybe Womble did it. Maybe somebody else did it. But Taylor didn't do it either. They spent a very, very long time making them out to be a liar. So maybe somebody at a previous hearing will find out if it was or was not a strategic decision. But I'm not terribly interested in it right now. But so can you address the remaining aspects that you're going to address? The only thing I was going to mention is just on John Taylor's credibility. And this may go a little bit to the issue here is Judge Arterton also commented during the sentencing about how credible he was. In fact, she watched him testify twice in this trial and then in Ephraim Johnson's trial and noted that the jury in Ephraim Johnson's trial had rejected Johnson's testimony and credited Taylor's. And she specifically said, because that's juries are very good at telling who's being truthful. And while it doesn't go directly to this statement, it does go to the atmosphere in the courtroom at the time that he was testifying. You would agree with me that he was, I mean, Ms. Van Ness and her co-counsel characterized Taylor as kind of like the linchpin to the conviction here. Would you agree with me that that's a fair statement? His testimony was crucial. It was very important. I believe there was a lot of forensic evidence, Your Honor. And I do believe that we would have been able to... Johnson is all over the place. Johnson, yeah. And Johnson's related to the defendant's girlfriend, right? Lashika Johnson was, is his sister, is Ephraim Johnson's sister. And she was one of a court... Right. So between her testimony and the forensic evidence, phone records, there was a lot of testimony... Taylor's a stranger to the business. Correct. Almost not. He's part of the business. And Ms. Johnson is Mr. Apert's one-time girlfriend. Right. And Ephraim is her brother. Correct. So they're all kind of known to each other. Taylor's the outside kind of like objective third party that sees this. So Taylor is kind of a linchpin to the case. He was an incredibly important witness. I won't... Not to say that if the jury convicted on the basis of the others, that there wouldn't be enough evidence. It's just that Taylor's evidence is mighty important to what actually happened. That's correct. Absolutely. Thank you. Unless there's further questions. Oh, you're co-counselor. Thank you very much. Can we please have the court. I'm Assistant United States Attorney at Jacksonville. I'd like to discuss for the government in honor. Um, I'd like to start by addressing this question with regards to, um, our question or our summation argument in penalty, um, where we made reference to Ephraim Johnson's statement. So the government did not just ask a question of Agent Munger. The government went on for about 13 pages of transcripts to demonstrate to the jury the inconsistencies in Ephraim Johnson's statements, the inconsistencies of those statements with the forensic evidence in the case. And so in summation, when we are discussing what relevance these statements could possibly have in the case, the only real relevance that they could have had was what was John Taylor's role in these offenses and what was Ephraim Johnson's role in these offenses. That's essentially what those statements spoke to. And in, in, in arguing to the jury that Ephraim Johnson's statements lack credibility, we argue that the statements were inconsistent within themselves, inconsistent with the forensic evidence presented at trial, and inconsistent with the theory of defense presented in guilt. You're perfectly free to show inconsistent testimony. The question is, are you free to say, to, to vouch? And that's because it was determined he was lying. Well, and then, you know, there were three or four different situations in which the government went beyond looking at the testimony, but actually said some things about what a, what the jury should view the person as doing. Now, the question of whether that in itself is enough or whether that calls for some specific discussion by the court is an interesting one, but it isn't simply doing what you were perfectly free to do. It's whether you went too far. Are you defending the, the ability to say that, or the ability to argue that the consistency or inconsistency of a defense position is something the jury can draw an inference from? Your Honor, we're defending our ability to comment on defense arguments. I understand, and I know that in the summation, this was a litany. You argued the inconsistencies, you argued facts, and Judge Calabresi's indicated that you're okay, up until the point where you say, and it's inconsistent with the position they took on Taylor's testimony at trial. And I'm asking you, if you're telling us that you think the government can urge an inference from defense strategy, I mean, it threw an objection and the court sustained it and told the jury to disregard the statement. Are you now telling us that what you did is perfectly acceptable? Your Honor, what the government intended to do through its argument in summation was to demonstrate that Efron Johnson's statements lack credibility. It was not the intent of government. Do you think you can do that by pointing to the difference in the defense position on Taylor at the culpability phase and at the penalty phase? Yes, Your Honor, we do. Do you think you can ask an inference be drawn from any strategy of the adversary? Not that an inference be drawn, but simply that the evidence is inconsistent with that argument set forth in guilt. We are in penalty. So the defense counsel already spent over an hour on summation in guilt, arguing a position, a theory of the evidence, if you will, to the jury. So we're not— The argument is in evidence. That's one of the basic instructions that a jury is given. It seems to me your only hope here is that the court's instruction was enough. And that strategy shouldn't enter into the jury's deliberation. Well, and we would agree with that, Your Honor. We would submit that if the court determines that it was error for the prosecutor to go as far as commenting on the strategy of the defense, which was not our intent by any means, shape, or form, the summation was 35 pages long, and these comments were about half a page worth of our summation. So in that context, Your Honor, if it was error, the instruction provided immediately, because the court did not wait until the end of summation. The court immediately sustained the objection and provided a curative instruction. All right. Well, as I understand the concern we're being asked to think about is that you asked some things, like the didn't get the agreement because he lied statement, that suggested you didn't believe, you yourselves, the prosecution, did not believe Efren Johnson. And now with this statement in summation, you're suggesting the defense doesn't believe what they put before you because they didn't take that position at trial. That's, as I understand, the strongest way to characterize the defense argument. They'll tell me if it can be put stronger still. Tell me why that doesn't persuade. In the first instance, Your Honor, the government was not in argument, vouching for the credibility of a witness. The government posed a question to a government agent. It went unanswered. It was objected to. The objection was sustained, and the government moved on. What was the point of that question if not the question? I mean, come on now. That question, specific as it was, you didn't get an agreement. He didn't get an agreement because he was lying. The question— You were doing a variety of—but that question, I'm sorry, as an ordinary human being, I've never been in a jury because I'm not an ordinary human being, unfortunately. I've been a judge and a teacher too long. But that question to an ordinary human being sounds like saying this person is a liar and we know it, not from some evidence that we know it from some evidence we have and other people aren't there. That's the point of it. That's why you did it. We beg to differ, Your Honor. The government at no point in time intentionally vouched for the credibility of any witness in this trial. We were at trial— You were saying you didn't believe him, not that you were vouching to believe that you believed someone. But to answer the court's question, the intent was to establish why a cooperation agreement was not reached. And it was important at that juncture for the government to establish the cooperation agreement was not reached because here we are cross-examining the case agent, not just any FBI agent, the case agent of the case who's been sitting at government table throughout the entire trial. Chris Munger. He solicited that he didn't have a cooperation agreement. That could be for lots of reasons, by the way. He may have wanted, you know, the moon and you weren't able to give him that. But instead you asked him if the reason he didn't get it was because the government thought he was lying. And we are not advocating that that was a proper question. We agreed that the objection of the court was properly sustained. What we are arguing is that by going on to cross-examine. And then at summation, you come back and say, and the defense didn't believe him either. I mean, you know, again, and that's one of my problems with saying the court should have, there should have been an objection. When that original thing was done, that might have been enough. But then you come back to something else and which speaks to the same thing. And it's at that point that I ask, should the court have done something to pull it all together? I think the court issued a curative instruction that was proper during summation. The defendant did not ask for any additional instruction. And I think it's also important to take into consideration why those excerpts of the they were submitted in support of the first mitigating factor that the, that a court submitted to the consideration of the jury that neither he, Efren Johnson, nor John Taylor would confront the death penalty for their roles in this offense. The government conceded that that mitigating factor had been proven during its summation immediately after making that statement. We concede. Yes, that is true. That has been proven. Not only that, then it was the, the heinousness of the crime and his, his accountability for multiple murders. So your honor, with all due respect, the forensic evidence alone accounted for the multiple murders. There were three bodies at this apartment. We don't need John Taylor to tell us that there are three people were killed. The heinousness of the crime, the heinousness of the crime goes to Taylor's testimony, essentially laughing and wanting other people. I mean, without that, I know we have a lot of these cases and the death penalty doesn't get imposed. What made this one was something that Taylor said. So that it is crucially important for the government, if it wants the death penalty to support Taylor in that respect. And it is there that Johnson's testimony, if it is to be believed, cuts, undercuts it. And that's, that's the essence of why these, it is very unusual to get a death penalty. And that's what the essence of this is. So to suggest that this somehow is almost harmless seems to me to be pulling us off in a complete. Your honor, there are two, there are two components to the cruel and depraved manner of committing the offense. The fact that it caused implicit torture upon the victim and physical abuse beyond that necessary to cause death. The medical examiner. Counsel, the jury found mitigating factors and found aggravating factors and ultimately decided that despite the mitigating factors, the aggravating factors were enough to sentence somebody to death. Something that is very unusual. That means that, you know, you have to look at all of the aggravating factors to, I mean, the jury couldn't have done it without it. But it's rather hard to say that it is harmless not to have had something which goes to one of the important aggravating factors that, you know, I, I'm inclined to agree with you as to the multiple murders. I mean, you know, there's plenty of evidence of that, but there was much more of it. There was much more, your honor. There was significant evidence of planning and premeditation these three murders. When the jury, when, when the court takes into account the overwhelming evidence in favor of substantial planning and premeditation, and I'd like to take just a minute to address that issue, although, uh, brother counsel did not. Yes, ma'am. All right. So ACOR advances for the first time on appeal that, um, a theory not exposed to the trial court that his motivation when he kicked in the door of Tina Johnson's apartment was to commit robbery. Who brings a drill to a robbery? Why would a robber steal a door? Excuse me, counsel. Are you saying that, uh, if there was sufficient unerring evidence of several aggravating factors, but as to one aggravating factor, there wasn't, this is harmless error? Certainly. I keep coming back to what Taylor said that seemed to me to be a very important aggravating factor. The other aggravating factors, there may have been plenty of evidence, but I don't know. Are you telling me? I'm about to address the court's issue, uh, question, your honor. Um, he kicked in the door. He brought a, he brought in a drill. He brought a murder kit to a murder. He brought duct tape to tie the victims with. He bought gloves to mask his presence at the scene. He bought a, he brought a gun to subdue the victims. He didn't use a gun to kill them. He brought bats to kill the victims with, and he brought a drill to steal the door. So the evidence of planning and premeditation of this crime was overwhelming. The injuries inflicted by these victims that were testified to by the medical examiner were substantial. The victims were methodically tied with duct tape, their hands tied behind their backs. We've read, and we know this is an awful case, and they're all awful cases, as your co-counsel properly said. The question is... Some cases that are worse than others. Well, that's the question. Sorry, that counsel case. Yes. That's the question, and that's the question with respect to Taylor's testimony, with respect to his essentially asking other people to join him. Without that, I don't know that a jury, maybe a jury would have sentenced to death, but that was the thing that stands out, and that's the thing that Johnson, if he is to be believed at all, casts doubt on Taylor to a degree that may make this a different situation. Your Honor, the... Does Johnson cast doubt on Achort recruiting the people, which Judge Calabrese was just talking about, or he cast doubt on whether it was Taylor or Achort who engaged in some of the heinous conduct, doesn't he? No, well, no, ma'am, he does not. So Frank Hodges, one of the sellers for Achort's Enterprise, testified that there was an attempt two days before this. He is fetched by Achort in order to knock on the door. He sees Achort standing with three other people, all dressed in black. We're not the jury. We're not making the decision. We're trying to understand how Johnson cast doubt on Taylor. We understand you don't believe Johnson and urge the jury. Where's the discrepancy as you see it? What Johnson's statement stated was that he saw John Taylor pull out a 10-inch pipe out of his pocket and strike Tina Johnson with it. And that's how she died, not the backs and the whole version of Taylor. But the government presented a forensic expert in penalty. I understand that you think your evidence is stronger, but that's the discrepancy, right? It's not about recruiting people. But he only says that he saw Taylor... Is that a yes or a no? Yes, ma'am. Okay. Now, counsel, your adversary said that this was offered to show that Taylor and Johnson, who were also culpable participants, were not getting the death penalty. You say you conceded that. And the jury unanimously affirmed it. Right. Then the other factor is the question of the heinousness of the crime and the multiple murders. You said something a while back I want to be sure I understand your view on. Do I understand you that you don't think role matters as to those two aggravators that anyone who participated in the conduct would be chargeable with the heinousness of the crime and the multiple deaths? Yes, I believe that's so, because the conduct was undertaken in concert with one another. The jury is in charge, though, that on the multiple murders, they could only consider the defendant's own conduct. Now, I know there's a law that might take a more expansive view, because after all, when one is the head of the mob hiring the hitman and orders multiple killings, it would be curious that you weren't chargeable with them. But in this case, the jury seems to have been charged that they should consider Acard's personal conduct. Did I misunderstand how this case went to the jury? No, that is correct. That is exactly how the case went to the jury. To that extent, it did make a difference whether the jury believed that Taylor killed someone with a 10-inch pipe or Acard or Acard and his brother killed them with baseball bats,  No, and I will explain why, Your Honor. The evidence shows that Taylor sees Acard beating Tina Johnson, sees his brother, I think, beating James Reed, and he's horrified, so he turns to leave the apartment. That's Taylor's testimony, that's not Johnson's. That's also Johnson's testimony, and I'm getting to that. So Acard's brother, Azikiwe, leaves with Taylor. Taylor doesn't say he sees Johnson hitting anyone. He says Basil is still laying on the floor of his bedroom when he leaves the apartment. Now Johnson tells his sister, Lashika Johnson, in the privacy of her own home and prior to any charges being filed, he confesses to her that he participated in the murders, that he was there and he helped Azikiwe tie up those people, and he roughed them up a little bit so that when he left the apartment, those people were alive. That was part of his testimony, but there was other testimony to the contrary. Yes, he also made sworn statements to the court where he said that he had absolutely nothing to do with the death of those people. We understand how the evidence looked at most favorably to you supports the guilt verdict. The question here is whether the government's actions at the penalty phase with respect to undercutting Johnson's credibility somehow require us to vacate the penalty verdict. And the two questions we've had particularly have been with respect to the claim that Johnson didn't get a plea agreement because he was lying and that even the defense didn't seem to believe him because they didn't take that position at the penalty phase. I know the defense argues there's other misconduct too, but our questioning is not how do you prove the case, it's how did this conduct not unfairly undermine Johnson's credibility? And led the jury, potentially led the jury, we don't know if it did or didn't, but potentially led the jury to do something which they might not have done had that not happened in a situation where the jury is given an authority by the Supreme Court that nothing else, because in every other context a court can come in later and do something. But here it is how it goes to the jury. Your Honor, if the court considers the record as a whole and considers the overwhelming evidence that was submitted as to guilt with regards to April's participation in these three murders independent of Taylor's testimony, and then considers how all of that evidence, including the fact that his DNA was at the scene, that his fingerprint was found next to Basil's body, if the court considers that evidence and how it corroborated Taylor's testimony, I submit to the court that the weight of the evidence presented would secure any error. You're suggesting that even if this was error, this was harmless? That's correct. Yeah, okay, okay, let's be clear on it. The court's instructions, together with the presumption the jury's following instructions is enough. I don't think... But you're saying you're arguing... All right, why don't we hear in rebuttal from counsel for Straycard? Just a few points. Just a few points. One is that the government argued in rebuttal that the torture aggravator is what set this case apart. Those were their words to the jury. It's the, come get you some, is what sets this case apart. It's the taping, the way in which they're taping, leaving Tina Johnson's eyes uncovered. That's what sets this case apart, and those come only from Taylor. Those two... Is there DNA evidence that Straycard had tape on his glove? There is evidence taken from the latex found in the tape used to bind Ms. Johnson, but it also, Ephraim Johnson's DNA is a match for having taped it. So it supports actually his testimony that he and Taylor helped tape Tina Johnson, which Taylor said he didn't do. So actually, Johnson's statements are better supported by the forensic evidence than Taylor. Taylor says he never went in the room. He never had any contact with her. But his DNA and Johnson's DNA are both found on the samples taken from the tape used to bind Tina and in the room. Let's not be unrealistic about what went on here. Johnson testified, or Johnson's statements come in, as here says, in a way that they would not have been admissible at trial. Nevertheless, the judge allowed them in. And the jury did hear considerable evidence of inconsistency within the statements, across statements, etc. So, you know, I'm not sure we just start with the assumption that, but for the government's error, everything that he said, Johnson would have been believed. And, you know, the jury knew that they'd heard from Taylor and heard all his inconsistencies, too, but they had, you know, eyeballed him and they had never eyeballed Johnson. So it's in that context, I think, that we have to fairly consider these errors that you attribute to the government. And I remain concerned as to how we how we say that the judge's instructions not to consider certain things were followed. She didn't instruct them not to consider the government's opinion, that they did Johnson's line. She didn't instruct them to not... Told them that they shouldn't consider, I mean, she struck the evidence. Struck it and she... The questions are not evidence and that they shouldn't consider that. She sustained the objection to the... It was determined he was lying. The government then returned to this theme within a few moments and reintroduced the fact that he's not beginning the cooperation agreement. The only purpose of that is to re-elicit the why. I'm not sure of that. You know, he changed his statement at the... That were favorable to the government. So knowing when he was... When he had a cooperation agreement, when he didn't, etc., would be relevant to the jury's understanding of each statement. But in any event, the judge did strike the reference to cooperation agreement. But told them that you should understand that the statements were given in the context of attempting to plead guilty. She never said you cannot take into account, you can't weigh and make... In evaluating these two witnesses, the government's own belief. And you're right, Judge, we're not arguing that the jurors would have been required to believe Johnson. The point is... Well, you know, all of these are plain errors. So what case do you want to say plainly established her obligation to give these instructions that you're now saying she didn't give to a respondent? The case cited by the government for harmless error... No, no, I... Let's, Judge Calabresi, let's put harmless error aside. What makes the error in not giving the unrequested instruction plain? So this plain error doesn't mean a possible error? United States versus... No, but it means that it's plainly established in our precedent that you have to give the instruction. United States versus Groysman is, with this court, reverse unplanned error, including for vouching. But that's a different kind of vouching. It's certainly not reverse vouching. And I'm not sure that there was an objection sustained. I mean, you're now not... I mean, I would agree that the government would have a really hard time having asked that question if it hadn't had an objection sustained. But they had an objection sustained. United States versus Modica, this court said the problem with the vouching is the jurors will tend to believe it no matter how baseless, unfounded it is. It goes to the heart of a fair trial. And the court has repeatedly warned prosecutors not to engage in recognizing the special harm of vouching. And in this case... Not sure in Modica. We are not sure since Modica we have ever found misconduct in the context that was found in that case. I think you have to do something, get something outside the standard plain error. I think to win, you have to argue that somehow in the capital context, because of a particular role of the jury, which makes this sentencing different from ordinary sentencing where plain error is much lower. And no one is arguing that plain error is much lower here just because of a particular context of the jury. Otherwise, plain error would be lower because it's sentencing. But it isn't because it's a very peculiar context that this context is so different from all the other contexts that there is a duty on the part of the court, since it cannot do anything else about the sentence, to make sure that the jury is fully and completely instructed. And that is something relatively new. It isn't saying this fits in plain error. It is something that we want courts, when they are doing a capital case and these things are there, to make sure in its instructions that the jury is fully aware of their role. That's what you have to convince us of. The application of plain error in the context of a capital sentencing, which is different than the fact finding at the guilt case. It takes a single juror under the Federal Death Penalty Act to result in a sentence of life without responsibility of parole. It is a moral response. So they make the findings as to the ads and the myths. And I would just quickly respond on the mitigator point. What the two accomplices did in the room alters... So the jurors found it unanimously that a reasonable doubt, found it unanimously. But what each of them did in the room matters for the weight. So if Johnson and Taylor are more involved in the crime, the fact that they are not getting death matters more. If they are, according to Taylor, passive witnesses who leave immediately, the fact that they are not getting death is not surprising as the government argued in its rebuttal. May I ask you on the government's argument and information about shifting defense strategy. If the government had never said that, but the jury, which after all was there for both the penalty and the death phases and saw the shifting strategy, had sent out a note during deliberations that said, what are we to make of the fact that at the guilt phase, the defense was that Taylor wasn't there, and that at the penalty phase, the defense seemed to take the position that Taylor was an active participant.  The starting point of you can't take the strategic considerations into account would have been a beginning, but the problem is the inference that involved the trial counsel's own beliefs as to the weight of that evidence. I didn't ask you that. I asked you what would have been the proper instruction. So you cannot speculate as to what that choice meant. You cannot... In essence, what the judge told them, yes. No, no more, right? So that you can't take the strategic consideration into account is, I think, almost endorsing the fact that the trial counsel believed Johnson wasn't telling the truth. So they need to be told, as in Griffin, right? The context in Griffin versus California, where the jurors, they realize that the defendant hasn't testified, they might take that into account on their own. It's worse to put it before them, but the way to fix that is to tell them you can't draw meaning from that. We don't know what that meant. There are many reasons why trial counsel might have chosen to try the case the way they tried it. It doesn't necessarily require that they didn't believe Johnson. Well, the government never argued that you didn't believe Johnson. I suggested that that could have been the best argument you would make, that that would have been an inference, but they never argued that. If you had a concern that they would assume that you had a disbelief in your own theory, I would have thought that that would have been a request for a charge. You know, it wasn't a request then. The charge wasn't given to the jury for several days after that, right? I mean, the time of the government misconduct that's alleged and the time of the final jury charge was several days later, if I looked at the transcript correctly. For vouching correct not for the summation, the summation occurred after the instruction. No, I'm talking about the final instruction to the jury before it began its deliberation. The last thing before they went in. Right, so it's several days after the summation. No, the instructions occurred first, then closings, and then the final instruction. Okay, but there was no request for it. That's correct. Okay. All right. Thank you very much. I think we're going to hear also from Ms. Van Nacken. I just have a few brief responses to the government's argument on the John Taylor Fund. Into the microphone. Ms. Dayton said that as the government does in their brief, that this one answer that he gave whereby he indicated to the jury that he expected to die in prison was not important in the context because Mr. Taylor had been extensively cross-examined about the lies he told when he was arrested and so forth. We have argued in our brief, and I just want to underscore that this was a completely different kind of impeachment. He was saying that he did not have a motive to lie, that he had no self-interested reason to not just do anything except tell the truth. That's a completely different kind of impeachment than he was given by the defense. Another thing is that the jury was given a series of cautionary instructions that the government has set forth in their brief on how, and you're all familiar with them, how cooperator testimony should be treated with great caution and care, and if the jury relied on Taylor's testimony that he expected to die in prison, those cautionary instructions to examine his testimony very carefully would have not applied to him. It would apply only to the other cooperators who acknowledged that they hoped to get a real benefit. The other thing I wanted to mention about prejudice is the concept of portionality, which is that Taylor had testified that he was convicted of three counts of felony murder and he didn't expect to get out of prison, even though he cooperated. So, faced with that testimony, I think it would be reasonable for jurors to say, well, in that case, Mr. Acar should get a death penalty. So, I think that's another prejudice of Taylor's testimony. Yes, he testified to that at the guilt phase, so I know his testimony was alluded to in the penalty phase, too. Was that argument made from that part of his testimony at any point? I didn't see that in the government summation. I'm sorry, go ahead. I'm suggesting that the jury would have thought, well, if someone who cooperated thinks he's getting life in jail, the defendant who didn't cooperate should get something worse. The government never advanced that argument. No, Your Honor, I'm not saying they did, but I think— And you've never advanced this argument as a grounds for that being an error, even in your briefs to us, right? You've never made this argument. I'm just making an observation about another form of prejudice to this. I'm not saying that the government made the argument. For the first time. Yes, Your Honor. Another point I wanted to make is that the government had mentioned in their appendix there were cites to Wamble's cross-examination about somebody named Boobie Rogers. I wanted to make the observation that Mr. Wamble, unlike Mr. Taylor, faced a 20-year sentence, not a life sentence, and he also said he was praying for lesser terms. So the fact that another cooperator was facing a similar drug conviction was offered a 10-year sentence. The defense attorney apparently had that information, and they crossed him on it. But I think the difference between crossing Wamble on that and crossing Taylor when there's no evidence that the defense attorney knew about this single-digit sentence for a cooperator makes that different. One brief point on the substantial planning point. The government has argued that, pointing to all the evidence of the masks and assembling the team and so forth and so on, I just want to underscore that Mr. Taylor knew all of that himself, and yet he thought they were going in to commit a robbery and or to evict the people, to tear the place up and move them out. So it's not obvious. I don't think that that evidence leads to the idea that the murders themselves were substantial plans and premeditated. The drill... Well, I think the drill is consistent with the plan that... I was a state court judge, trial judge for seven years, and I did a lot of robberies. I don't ever remember anybody showing up for a robbery in a home with a drill. Well, they did break the door down, so in order to keep people from coming in out of the hall, the drill was there to drill the door shut. It gave the defendants an opportunity to flee. And I also think it's consistent with the eviction idea, which is that if they went in without planning murders, but only to rough the people up and send a message that her miniscule drug dealing would not be tolerated, that there would be a good way to do it to make them crawl out the window, as he did, and prevent them from getting back in the apartment without a lot of trouble. Did he lose identity or lost his identity when he was enforcing his term with others who had transgressed and moved into his area of economic activity? No, but he lost his identity. No benefit if they don't know that you're the guy who's enforcing the turf, is there? I think the point we have made about the mask inside the apartment is that Tina Johnson was, and I mean no disrespect by this, but it was clear that she was a feisty person who could very well have turned him in, gone to the police if she felt like it, even though she would have to implicate herself in drug dealing if she had known for sure that this person was responsible for the break-in, okay? And then finally, just very, very briefly, the government has made an argument that the statements between Johnson and Taylor made about who was left alive in the apartment was a reason why it was clear that Mr. Carr must have been responsible for Mr. Williams' death. We have made an argument in our required brief in pages 52 and 53, which is to say that those two statements are actually irreconcilable with each other and they can't be relied on. There was a suggestion made, thank you very much, there was a suggestion made, Judge Calabresi, that the defense might be urging us to find that plain error review should not be applied in capital cases at the penalty phase, and I'm wondering whether we should invite some further submission on that point, just to make sure we give both sides the opportunity to be heard. So at a minimum, if you can cite us to any precedent, whether from federal courts or even from state courts that have considered capital cases as to the propriety of applying plain error to the penalty phase, and if the defense is indeed urging that position that penalty phase analysis should not be limited to plain error review, anything you want to say in support of that will give you up to 10 pages of double space, and the government too, if you could respond to that. So let me just get a calendar. And specifically, not just whether there is in this area, but whether there are other areas where courts have held that despite the agreement of the parties, there are duties on the court, sua sponte, apart from that. That makes reference to the Nelson case, which is a very different case, but where the parties actually agreed on a jury of a particular type, and our court said there was a sua sponte duty of the court to do more. May I? I could ask the parties to do that by all means. It is possible, I don't know, that we may ask you, that I may ask you to brief something that has not been briefed at all, but which derives from the very repeated arguments on arbitrariness that you had made on the arbitrariness of the applicability of the death penalty that your briefs made at considerable length. That got me thinking, and let me just try to explain this because it may help you in briefs. If you look at how the cruel and unusual, what they have done is to ask whether the punishment applied to a particular crime by particular people, crime like rape or people like minors, is sufficiently uncommon among the various states, and if it is sufficiently uncommon, that is done only in five or six states, that is cruel and unusual, but if it is done in quite a few states, then it is not. What came to mind is that that position, though we're bound by it, and I'm not an originalist, and so the fact that it isn't an originalist position may be okay, cannot be right from an originalist point of view, and it cannot be right, at least it seems to me that an argument can be made that it cannot be right from an originalist point of view because the phrase cruel and unusual punishment derives from England and from how it was used in 17th century and 18th century England. Now, England couldn't count anything. I mean, what could it count? England was a unitary state, so it couldn't count what was done in one part of England or another. It couldn't do it. There was one law, so either they were counting what happened in cognate nations, which the Supreme Court has rejected. If you counted what happened in other countries, the death penalty would clearly be unconstitutional because very few countries have it, but the Supreme Court said no, that's not what we're doing, or what they must have done was to ask whether capital punishment for that particular crime was unusual in England, that is, imposed sufficiently rarely that its imposition was likely to be inconsistent and arbitrary. Now, that from an originalist point of view is very likely to have been, or at least I'd like to hear argument, what it meant in England at that time. If that is so, that has very strange consequences for the United States. It would suggest that capital punishment might not be cruel or unusual in those states that apply it with sufficient frequency fitted to a particular crime, that it is not arbitrary, but might be cruel and unusual in those particular states where it's done once in a blue moon for some reasons, which may be because a jury got this or because a particular prosecutor did that or something, but that that is what England and, by extension, the United States wanted to have prohibited, and that in that sense it may be that might seem odd from a federalist point of view, but it isn't, because federalism is that some states can do something which other states can't stand. That's the nature of our federalism, so it might be okay if it is done from this point of view. There may be other problems in Texas if it is done frequently enough so that it isn't arbitrary, but not okay in a state where it is okay. Ours is federal. So then the question is, how frequently has the death penalty been imposed for this type of crime in the United States? Now, I've just done very preliminary things, but it's quite fascinating. In 90 years, almost all of the death penalties that have been imposed have been for military terrorism, killing of federal agents, almost never kidnapping under the Lindbergh law, under a provision that has since been held unconstitutional, but apart from that, either in federal territory or linked to something like banking, drugs, prohibition, and so on, almost never imposed, and in the last 50 years, the death penalty federally has only been imposed three times and only once for a crime of, for something that fits into this category. Now, is that cruel or unusual in this particular peculiar sense of, we don't mean that it's wrong in this case, but that the danger of arbitrariness is sufficient that it was fought to be prohibited. So I might, I don't know, but I might want to see something. Now, I know that this hasn't been argued. On the other hand, an originalist argument, as we have learned, quite properly, can always be made. Right, we won't use Judge. We'll ask him to give us 10 pages on that subject, and since this will take a little longer, obviously, and I'll hold you to September date, why don't we instead say that you can file on that subject at the end of October. That should give you plenty of time, and this one I'll make sequential filing since the government should be entitled to respond to the defense position. So if we could ask for the defense submission here, October 28, that's two months, and from the government, we'll say November 22nd. That'll be right before Thanksgiving. No, no, I want the, you'll give us the one on plain error first, just as we've And I suspect I don't really have to say this to such experienced counsel, but Judge Calabresi and I have been thinking about federalism and the death penalty for a while in the case of United States versus Bell, and I will leave you to sort out for yourselves whether some of his concerns identified today require a merging of originalist and more flexible theories of the Constitution to be merged. In any event, you'll give us what help you can. We thank you very much for your arguments. This argument, by the way, is separate from, I believe, from any argument that Judge Raji and I may have had in federalism. And we've talked about whether the Constitution has to apply equally to all the states as opposed to saying that because they imposed the death penalty in Texas, you could have a federal law that said that the federal death penalty could be imposed in Texas and not in Connecticut. Thank you, counsel. We're going to stand adjourned. Thank you.